In re:

RONALD NEWMAN,

        Debtor.

_____/

WILLIAM KLEIN,

        Plaintiff,

v.

RONALD NEWMAN,

        Defendant.

_____/

Case No. 25-30026-jda
Hon. Joel D. Applebaum
Chapter 7

Adv. Pro. 25-3036

### OPINION GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING PARTIAL SUMMARY JUDGMENT FOR PLAINTIFF

This matter is before the Court on the Motion for Summary Judgment filed by defendant Ronald Newman ("Defendant" or "Newman"). For the reasons explained below, Defendant's Motion for Summary Judgment is GRANTED as to Count I (breach of contract) and Count III (violation of the Michigan Vehicle Service and Repair Act "MVSRA") of the complaint filed by plaintiff William Klein ("Plaintiff" or "Klein"). This Court GRANTS summary judgment in favor of Plaintiff on Count II (conversion under § 523(a)(6)) and Count IV (fraud under § 523(a)(2)(A)) of his

complaint. The Court will hold a telephonic pretrial conference on June 17, 2026 at 11:00 a.m. EDT to discuss next steps and to schedule a trial on the sole issue of non-dischargeable damages.

## I. FACTUAL BACKGROUND

Plaintiff purchased a 1999 International 4700 truck to earn income by hauling vehicles and campers across the country. The truck, however, was designated a farm grade vehicle and, therefore, needed various upgrades to pass a State of Michigan Department of Transportation ("DOT") road-worthiness inspection before Plaintiff could use it on State highways.

Sometime prior to July 13, 2022, Plaintiff performed an online search for a mechanic to perform these necessary upgrades. Plaintiff's search led him to Defendant and, on July 13, 2022, Plaintiff and Defendant began texting each other about the job. (Dkt. 21, text messages). During these communications, they agreed that Defendant would obtain the necessary parts and make the upgrades for $3,600. Defendant assured Plaintiff that he could get the truck ready to pass a DOT inspection and that he could complete the work in about one week. (Dkt. 21, text messages, p. 18). Plaintiff and Defendant did not have a formal written contract. Rather, contractual terms were embedded in a lengthy series of text messages between Plaintiff and Defendant and Plaintiff and Elisabeth Spencer of LRS Truck Restoration, a company allegedly owned by Newman. Defendant has not argued

that an enforceable contract was not created, but only that the contract was not breached by Defendant or, if it was breached, that such breaches do not render Plaintiff's claims non-dischargeable.

Before delivering his truck to Defendant, Plaintiff had ATS Fleet Service, a truck service company unrelated to either Plaintiff or Defendant, to perform a DOT inspection. On July 19, 2022, ATS Fleet Service provided Plaintiff with its service report listing the necessary repairs required to pass inspection. Specifically, the service report stated:

> Performed federal annual DOT inspection and truck failed. Made list of needed repairs and recommendations for customer. Check and recharge A/C system. Found no leaks with vacuum. Charge A/C with dye. System will need ran and please inform us of any noticed leaks and exposed dye. Found button to turn on compressor is not working correctly. Set up tuner and send files out to pathhungry per customer request. Received files and followed procedures to tune the PCM. Put 250 HP tune in it and drove. Runs good.

(Dkt. 22, Ex. 4).[1]

On or about August 8, 2022, Defendant and Plaintiff first met in Farwell, Michigan. Defendant arrived at this meeting driving a large service mechanic's truck for Flory Line Construction. According to Plaintiff, Defendant claimed that he owned the truck, that he leased it to Flory Line Construction, and that he worked

---

[1] All spelling, grammar, and punctuation in all quotations are as they appear in the original.

for them as a subcontracted mechanic.[2]  Defendant also claimed to be trying to build up his business, LRS Truck Restoration, located at 10637 S. Lewis Road, Clio, Michigan.  The Lewis Road address housed many vehicles which Defendant claimed were all or mostly owned by him and which were either going to be fixed and sold or dismantled and used for parts.

On October 9, 2022, Plaintiff dropped off his truck at the Lewis Road property where Defendant was to provide the parts and perform the necessary upgrades.

On October 13, 2022, Elisabeth Spencer, an agent and director of LRS Truck Restoration, text messaged Plaintiff to confirm the work to be performed. (Dkt. 23, Ex. 6, p.1).  In this text stream, Spencer asked Plaintiff for a copy of whatever proposal Defendant had provided to Plaintiff.  Plaintiff responded that Defendant did not provide him with a written proposal, stating:

> Don't think it was a text.  Just in conversation.  Was swap rear end with air, new gear and compressor.  Also, extra fuel tank. I supplied the leaf springs bushings, shocks and have pads for front.  Said since I am giving him calipers and brake parts for the rear end he is keeping, he will supply new one he is putting in or at least pass his DOT inspection. Quoted $3600 for that work. . . Only other thing was he was trying to find different rims.

---

[2] Although Defendant denied this allegation (Dkt. 7, ¶ 43), for the reasons set forth in endnote 1, the Court finds that Defendant is not a credible or reliable source of information.

4

(Dkt. 23, Ex. 6 p. 1). Spencer then responded, "Okay. I'll go over it and have Ron get a hold of you tomorrow to make sure we have what was discussed correct . . . ." *Id.*

Based on Defendant's assurances that he could complete the job in about one week, Plaintiff entered a "lease to own" trailer agreement so that he could begin hauling freight as soon as the necessary upgrades were completed.

On February 17, 2023, *four months after* Plaintiff left his truck in the care of Defendant and after many inquiries about the status of his truck, Plaintiff sent the Defendant the following text:

> I am giving it until Friday next week to be done, by done I mean rear end install with dump value and gage in cab, driveshaft installed, battery box and everything else buttoned up and DOT passable and inspected like you told me repeatedly you would do. I will finish cutting down frame and have a licensed mechanic finish everything else that you told me you would do all along. With that I will pay the agreed amount, but if it isn't done then we have two choices.
>
> 1. You buy the truck as is for the $16,000 I paid for it and we call it done, or
>
> 2. I report you and your business and you personally to the state and we end up in court. I really do not want to do either of those, but can not wait for you any longer. You call me and start screaming and yelling again and we jump straight to number 1 or 2. So unless you can be reasonable and rational when we talk, do not call thinking you are going to yell again.

(Dkt. 21, text messages, p. 79).

5

Defendant responded:

> I just read ur text. I get hold of u tomorrow after after I get back from Martin got truck on side of road need to get back here I'll give u a plan over the phone. And if ur don't want to do that then ur more then welcome to try a law due. But number 1 is not gonna happen that truck ain't worth more then 3 or 4 grand total. If u paid that no wonder ur broke. I won't even consider that at all. Have good evening shouldn't be no later than 1 or 2. That give u time to set up a recording of the conversation. But I'm not agreeing to that so it won't be legal so don't try it. I m very well at knowing with what is legal. Have good evening.

(Dkt. 21, text messages, p. 80). The text messages between the parties continued with the Plaintiff wanting to pick up the truck in the condition in which he left it and with the Defendant warning Plaintiff not to come onto his property. Plaintiff then stated:

> You have until Sunday to finish the truck and I will still pay, but not paying before its done. I can even take the driveshaft and get it done so you don't have to pay for it and I can have it done in about 48 hours.

(*Id.*, at p. 85). Many of the pages of text messages show a frustrated Plaintiff trying to get Defendant to either complete the job or return the truck, (*Id.* at pp. 85-97), neither of which occurred.

Shortly thereafter, Plaintiff filed a complaint against Defendant with the State of Michigan, Business Compliance and Regulation Division, seeking its help to get his truck back. Plaintiff's complaint stated:

> guy appeared professional, but has a person that isnt qualified working on my truck and the job I was told would take 4 to 5 days to complete has been almost 4 months. he has refused to ever give me an invoice about work to perform or price in writing. now he refuses to finish the

6

work, but is telling me if I want my truck back I have to pay more than the original agreement or I wont get my truck back. Ron who claims he can have anyone he wants to work on my truck as long as he checks it later. he now will not guarantee any work and scream at me that he doesnt care what the rules are from the state because he can do what he wants and at one point threatened to delete my truck so I cant drive it if I dont pay and cant have the truck until I do.

(Dkt. 19, Ex. 1).

In a text message sent shortly after Plaintiff filed his complaint with the State, Defendant menacingly wrote, "U had the option, U never will make it as a truck drive or owner. Watch." (Dkt. 21, Ex. 3, text messages, p. 114).

On March 23, 2023, the State of Michigan, Business Compliance and Regulation Division issued a Temporary Order to Cease and Desist (the "Cease and Desist Order") to LRS Truck Restoration, LLC ordering it to stop operating a vehicle repair facility. The Cease and Desist Order further stated, in part, that:

- on February 28, 2023, a State Investigator had arrived at the Lewis Road address and interviewed Jeffrey Brady, an unlicensed mechanic who worked for LRS;

- Brady told the State Investigator that he and Ronald Newman had been working on a truck for Klein;

- on March 2, 2023, the State Investigator spoke with Newman by telephone and confirmed that Newman was performing major automotive repairs for Bill Klein, that Newman is not a state certified mechanic and that neither Newman nor LRS is licensed.

(Dkt. 19, documents related to State investigation).

A copy of the Cease and Desist Order, along with the State Investigator's business card, was posted at the Lewis Road address on March 28, 2023. On March 30, 2023, Defendant called the State Investigator with questions about the Order. (Dkt. 19, Ex. 1, Investigator's Notes).

The State Investigator wrote up a narrative of his findings which states, in part:

> . . . Bill [Klein] stated that he located Ron [Newman] on-line and met Ron who was driving a large truck. Bill stated the truck made it look like Ron was legit. Bill took his vehicle to Ron and dropped it off. I have been to the property which does not contain any type of signage indicating that there is a business at the location going by the name of LRS Truck Restoration. . . Bill stated he has asked Ron about his license after dropping off the truck and the fact that Ron has a guy by the name of Jeff working on his truck. Ron told Bill that he can have anyone complete the repairs as long as Ron inspects the repair once completed. Bill stated he talked with Jeff who told Bill that he really doesn't know what he is doing when it comes to the repair of the truck. . . Jeff is not a certified mechanic. . . Bill stated had he known that the repair facility was not properly licensed he would not have taken his truck there. . . Ron is not a certified mechanic, and the company does not hold a valid repair facility license. . .
>
> I did make contact with Ronald Newman by phone. . . Ron stated that Bill made contact with him wanting Ron to perform repairs on his international truck. . . Ron said he has called Bill and told him that he needs to pay for the repairs before Ron will finish the repair. . . I asked Ron if he is a state certified mechanic and he stated he is not. . . Ron tried to tell me that he was not completing repairs for the public. I again told Ron that he is completing repairs for Bill on a truck that Ron does not own, and he is charging Bill for the repairs. Ron tried to tell me

that he is only charging Bill for parts and that Bill is installing the parts not him and Jeff . . .

On 02/28/2023 I did arrive at the location of Bill's truck. When I arrived, I made contact with Jeffrey Brady. . . Jeff said that Ron sold Bill the parts to make the system full air ride and Jeff and Ron have been installing them. I asked Jeff if Bill performed any of the repairs. Jeff said that Bill never helped it has been just him and Ron. Jeff stated Ron told Bill un [sic] front the cost and now that they are almost done Bill does not have the money and wants to make payments for the repairs. Jeff stated he knows that Ron and Bill have been arguing over the payment. Jeff stated that the truck just needs a drive shaft and it will be done. . .

(Dkt. 19, Ex. 1, Investigation Findings).[3]

The State Investigator also produced a list of Defendant's violations of the applicable State regulations, including:

| | |
|---|---|
| Violation: | F15-257.1307(d) |
| Description: | Failed to reveal a material fact to a customer |
| Note: | Ronald Newman failed to reveal to Bill Klein that the facility and himself were not properly licensed |

(Dkt. 19, Ex. 1, Violations).[4]

---

[3] Although the State Investigator's narrative in the report is not dated, the Report indicates "Report Generated Date: 26-March-2025."

[4] Although the State Investigator referenced MCL 257.1307(d) as the statute violated, it is unclear whether the basis is MVSRA 25.1307(d) or (e) or both. MVSRA 257.1307 states, in relevant part:

257.1307 Prohibited conduct. Sec.1.

On June 26, 2023, Plaintiff, still not in possession of his truck, filed a complaint for breach of contract against Defendant in Tuscola County Circuit Court, seeking damages in the amount of $167,826.31 because of Defendant's failure to complete the upgrades in a timely manner. (Dkt. No. 17, Ex. E, Brief, p. 3).[5]

On June 10, 2024, Defendant filed his amended answer to the state court complaint, asserting that Plaintiff failed to pay for parts he installed.

The case was scheduled for trial to begin on January 9, 2025. On January 8, 2025, Defendant filed his bankruptcy petition and, as a result, the state court action was stayed.

---

A motor vehicle repair facility that is subject to this act, or a person that is an owner or operator of a motor vehicle repair facility that is subject to this act, shall not, directly or through an agent or employee, do any of the following:

   *     *     *

(d) Make, either written or orally, an untrue or misleading statement of a material fact to a customer.

(e) Fail to reveal a material fact to a customer that the customer could not reasonably know if that omission tends to mislead or deceive the customer.

[5] This amount includes the lost value of the truck ($13,500.00), the parts purchased for the truck ($400), insurance premiums paid ($1,500.00), lease payments for the trailer ($10,867.95), lost income ($135,471.00), and the increase in the cost to obtain a Class A commercial driver's license ($4,600.00).

On May 30, 2025, Plaintiff filed his *pro se* adversary complaint seeking to determine that his claim against Defendant is non-dischargeable. The complaint contains four counts: Count I - Breach of Contract; Count II - Conversion; Count III - Violation of the MVSRA (MCL 257.1301); and Count IV - Fraud under §523(a)(2)(A). The factual basis underlying the complaint is that Plaintiff's injuries were caused because Defendant held himself out to be a licensed mechanic when he was not, did not complete the agreed-upon repairs, damaged Plaintiff's truck, refused to relinquish possession of the truck, and improperly removed truck components belonging to Plaintiff for Defendant's personal use.

On June 30, 2025, Defendant filed his answer to the complaint. Defendant states that he did not release the truck because Plaintiff failed to pay him for the parts.

After recovering his truck from Defendant in September 2025, Plaintiff had the truck towed to ATS Fleet Service to assess its condition and the cost to repair. [6] On September 23, 2025, ATS Fleet Service issued its report with the following notes:

> Inspect truck that was towed into shop. Found coolant was empty. Appears to be leaking from radiator. Radiator and CAC looked damaged and in poor condition. Missing fuel filter. Multiple broken and

---

[6] While it is unclear when Klein recovered his truck, Klein likely had his truck towed directly from Newman's location to ATS Fleet sometime before ATS Fleet issued its second evaluation of the truck on September 23, 2025.

missing manifold bolts. Missing D/S fuel cell and batteries along with battery tray. Several wiring connections are unplugged and harness plugs are unpinned. Has fuel in P/S tank but has sediment in bottom of tank. Air compressor not hooked up and no air tank on truck. Unable to source wiring schematic to determine how to plug wiring back into harness plugs. Each wire would need figured and OHMED to source. Unable to complete any repairs due to condition of truck nor are we able to source schematics needed. Our opinion is the repairs needed would far supersede the value of truck.

(Dkt. 22, Ex. 4). Attached to this inspection report is a partially illegible handwritten list of repairs needed:

1. Drive axle brakes and rotors. Probably will need brake calipers

2. Wire not secured on frame, steer axle spring [can't read handwriting] and [??], steer axle shocks

3. Tire rods and tube

4. No reflective tape of on top of cab

5. No reflective tape on back of [??]/mud flaps

6. Mud flaps not secured properly

*Id.*

On November 25, 2025, Defendant filed his Motion for Summary Judgment arguing that Plaintiff cannot establish the required elements under §§ 523(a)(2) and (a)(6) (Counts II and IV) and that Counts I and III (breach of contract and violation of the MVSRA) do not support a finding of non-dischargeability as a matter of law. Defendant attached the following exhibits to his Motion:

Exhibit A:  Klein's State Court Complaint for breach of Contract dated June 26, 2023;

Exhibit B:   Newman's Amended Answer dated June 10, 2024;

Exhibit C:   State Investigator findings, report generated on March 26, 2025;

Exhibit D:   Klein's State Court Motion to Strike Newman's Answer and Brief filed November 17, 2023; and

Exhibit E:   Klein's State Court Brief with attached text messages between Klein and Newman from July 13, 2022 to April 12, 2023.

On January 7, 2026, Plaintiff filed his response and brief in opposition to Defendant's Motion. (Dkt. 18). Along with his response brief, Plaintiff filed the following exhibits:

Exhibit 1:   Cease and Desist Order and related documents (Dkt. 19);

Exhibit 2:   portions of the MVSRA and the Motor Vehicle Code (Dkt. 20);

Exhibit 3:   123 pages of text messages between Klein and Newman from July 13, 2022 to April 12, 2023 (Dkt. 21);

Exhibit 4:   truck and parts related documents including loan and purchase documents, documents relating to obtaining a commercial driver's license, and a list of repairs needed as of July 19, 2022 and a list of repairs needed as of September 23, 2025 (Dkt. 22);

Exhibit 5:   copy of the state court complaint and answer (Dkt. 23);

Exhibit 6:   text messages with Elisabeth Spencer from October 13, 2022 to March 15, 2023 (Dkt. 23);

Exhibit 7:   documents related to the lawsuit filed against William Klein for his failure to repay the loan he took out to pay for the trailer (Dkt. 23);

Exhibit 8:   state court pleadings for action filed by Klein against Newman (Dkt. 23);

Exhibit 9: pictures showing damage to the truck including pictures of the condition of the truck prior to leaving it in Defendant's care (Dkt. 24, Ex 9, pp. 1-3) and after Plaintiff recovered the truck from Defendant: missing wheels and tires (Id. at p. 4), missing bolts (Id. at p. 5), a missing headlight (Id. at p. 6), a bent frame (Id. at p. 7), missing batteries, steps, battery box, power invertor, driveshaft, rear axle, stereo, amplifier, speakers (Id. at p. 8), and a missing stereo system (Id. at p. 9).

Exhibit 10: (A) transcript of 341 hearing dated March 3, 2025; (B) Continued 341 hearing held March 17, 2025; and (C) conversation between Newman and Klein on January 23, 2023 (Dkt. 24); and

Exhibit 11: Klein's summary of text messages regarding delays in repairs and supporting documents (Dkt. 25). [7]

Following oral argument held on March 18, 2026, the Court took the matter under advisement, and allowed the parties to submit supplemental briefs. (Dkt. Nos. 32 and 34).

## II. <u>JURISDICTION</u>

Bankruptcy courts have jurisdiction over all cases under Title 11 and all core proceedings arising under Title 11 or arising in a case under Title 11. *See* 28 U.S.C. §§ 1334 and 157. Core proceedings include proceedings to determine

---

[7] The proof of service attached to Plaintiff's response and brief in opposition to Defendant's motion for summary judgment (Dkt. 18) states that service of these exhibits was made on Defendant's counsel, along with an audio recording. The Court cannot tell if this audio recording is different from the transcript filed as part of Plaintiff's Exhibit 10. (Dkt. 24).

dischargeability. 28 U.S.C. § 157(b)(2)(I). The parties have also expressly consented to the entry of final orders and judgment by this Court. (Dkt. 12).

### III. <u>APPLICABLE LAW</u>

**A. Standard for Summary Judgment**

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056 (Rule 56 applies in adversary proceedings). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To demonstrate a genuine issue of material fact in dispute, the non-movant must

present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *Liberty Lobby*, 477 U.S. at 252. The Court must believe the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *Liberty Lobby*, 477 U.S. at 255.

Even if a party does not move for summary judgment, "[a] court may enter summary judgment *sua sponte* in favor of a nonmoving party so long as the losing party was on notice to present all desired evidence on the matter at issue." *In re Stat Emergency Med. Servs., Inc.*, No. 23-31085-JDA, 2025 WL 2404270, at *4 (Bankr. E.D. Mich., August 19, 2025); *See also*, *QSI Holdings, Inc. v. Alford*, 382 B.R. 731, 736 (Bankr. W.D. Mich. 2007), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) and *Salehpour v. Univ. of Tennessee*, 159 F.3d 199, 204 (6th Cir.1998). Here, Defendant had ample opportunity to present his evidence concerning Plaintiff's complaint. Defendant's supplemental brief acknowledges that "this is not a case in which additional factual development could alter that analysis." (Dkt. 32, p. 7).

## IV. <u>ANALYSIS</u>

Plaintiff seeks to hold non-dischargeable four claims against Defendant: Count I (Breach of Contract); Count II (Conversion); Count III (Violation of the MVSRA – MCL 257.1301); and Count IV (Fraud under § 523(a)(2)). Because breach of contract claims and claims under the MVSRA are not claims which meet any of the statutory criteria required to support a finding of non-dischargeability

16

under § 523(a), these claims are dischargeable as a matter of law. Accordingly, summary judgment is granted in favor of Defendant on Counts I and III of Plaintiff's complaint. The two remaining counts -- Count II (Conversion) and Count IV (Fraud under § 523(a)(2)(A)) -- allege claims that may be non-dischargeable and are discussed below.

**A. Standards for the Non-Dischargeability of a Debt under 11 U.S.C. § 523(a)**

Relief under the Bankruptcy Code was designed to provide "honest but unfortunate debtors" with a fresh start by granting a discharge of their debts. *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934). Notwithstanding the general availability of the discharge, § 523 of the Bankruptcy Code specifically enumerates certain debts that are not discharged in bankruptcy for various public policy reasons such as those debts resulting from intentional wrongdoing. The Bankruptcy Code recognizes that society's interest in excepting such debts from discharge outweighs a debtor's need for a fresh economic start. Exceptions to discharge are to be strictly construed against the creditor and in favor of the debtor. *Tweedie v. Hermoyian (In re Hermoyian)*, 466 B.R. 348, 359 (Bankr. E.D. Mich. 2012).

In this case, Plaintiff seeks to have his claim against Defendant deemed non-dischargeable under § 523(a)(2)(A)(fraud in the inducement) and § 523(a)(6)(willful and malicious injury). Specifically, Plaintiff seeks non-dischargeability under §523(a)(2)(A) on the grounds that Defendant obtained possession of his truck by

misrepresenting his status as a licensed mechanic, resulting in damage to his truck. In addition, Plaintiff seeks to hold his claims non-dischargeable under § 523(a)(6) on the grounds that Defendant acted willfully and maliciously by rendering Plaintiff's truck inoperable and by converting truck parts belonging to Plaintiff to Defendant's personal use.

### 1. Non-Dischargeability of Debt Under 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) excepts from discharge any debt "for money, property, [or] services . . . to the extent obtained by false pretenses, a false representation, or actual fraud. . . "  The purpose of 11 U.S.C. § 523(a)(2) is to prevent debtors from retaining the benefits of property obtained through fraud.  *XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.)*, 16 F.3d 1443, 1451 (6th Cir. 1994).  To prevail on a claim under this section, a plaintiff must show that:

> (1)[T]he debtor obtained money, property or services through a material misrepresentation that at the time the debtor knew was false or that he made with reckless disregard for the truth; (2) the debtor intended to deceive; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

*Accord, Rembert v. AT&T Universal Card Services, Inc. (In re Rembert)*, 141 F.3d 277, 280 (6th Cir. 1998).  *See also*, *Digital Commerce Ltd. v. Sullivan (In re Sullivan)*, 305 B.R. 809, 823 (W.D. Mich. 2004).  A "false pretense" involves an implied misrepresentation or conduct intended to create or foster a false impression. False pretense, in turn, has been defined to include a "mute charade," where the

debtor's conduct is designed to convey an impression without oral representation. A "false representation," on the other hand, is an expressed misrepresentation. *In re Rapp*, 375 B.R. 421, 433 (2007) *citing James v. McCoy (In re McCoy)*, 114 B.R. 489, 498 (Bankr. S.D. Ohio 1990) (citations omitted). With respect to § 523(a)(2), the creditor must prove each element by a preponderance of the evidence. *Rembert*, 141 F.3d at 281.

### a. Defendant Obtained Money, Property or Services Through a Material Misrepresentation that at the Time the Debtor Knew Was False or That He Made With Reckless Disregard for the Truth.

In this case, Plaintiff alleges that Defendant held himself out as a certified, licensed mechanic and, based on that misrepresentation, Plaintiff entrusted his vehicle to him to perform the necessary upgrades and repairs. Instead, Defendant removed parts belonging to Plaintiff from Plaintiff's truck. And while Plaintiff admits that Defendant did not expressly tell him that he was a certified mechanic before entering into the contract, Plaintiff argues that Defendant intentionally fostered that misimpression, relying on the following:

(1) From July 13, 2022 to October 9, 2022, Plaintiff and Defendant exchanged numerous text messages regarding Defendant providing parts and upgrades to Plaintiff's truck. (Dkt. 21, text messages, pp. 1-25);

(2) Defendant assured Plaintiff he could complete the work in a week or so. (Dkt. 21, text messages, pp. 18, 48, 114);

(3) Plaintiff raised the necessity of passing a DOT inspection multiple times in the text messages before Plaintiff dropped off his truck with Defendant. (Dkt. 21, text messages, pp. 5, 20);

(4) Defendant stated that he could get the truck ready for a DOT inspection;

(5) When Plaintiff first met Defendant, Defendant was driving a large service mechanic's truck for Flory Line Construction. Defendant claimed that he owned the truck, that he leased it to Flory Line Construction, and that he worked for them as a subcontracted mechanic;

(6) Defendant told Plaintiff that he was building up his mechanic's business, LRS Truck Restoration;

(7) Defendant told Plaintiff that the many vehicles housed at the Lewis Road location were (mostly) his and he was going to fix, sell, or use them for parts;

(8) On October 13, 2022, Elisabeth Spencer, the agent and director of LRS Truck Restoration, messaged Plaintiff to confirm the scope of the work to be performed. (Dkt. 23, Ex. 6, p.1);

(9) Defendant continued his charade after the contract was made by telling Plaintiff that he was a certified mechanic during a conversation on January 23, 2023. (Dkt. 24, Exhibit 10C, p. 1); and

(10) Plaintiff believed Defendant was a licensed mechanic when he reported his problems with the State of Michigan, Business and Regulation Division, prior to learning that Defendant was not licensed.

Numerous courts have held that a debt incurred after a contractor expressly misrepresents that he or she has the requisite license is non-dischargeable under §523(a)(2)(A). *See, e.g., Bottari v. Baiata (In re Baiata)*, 12, B.R. 813, 819-820

(Bankr. E.D.N.Y. 1981)("[t]he incidence of license conveys to lay persons a concept of authority and standards of workmanship impacting on reliance"); *Sinha v. Clark (In re Clark),* 330 B.R. 702, 707–708 (Bankr. C.D. Ill. 2005)(contractor's false representation to creditor that he was licensed and insured was sufficient for purposes of 11 U.S.C. § 523(a)(2)(A)); *McCain v. Fuselier (In re Fuselier)*, 211 B.R. 540, 545 (Bankr.W.D.La.1997) (finding that the debtor knowingly misrepresented to creditors that he had a general contractor's license and holding that the debt at issue was non-dischargeable under § 523(a)(2)(A)); V*aks v. Grenier (In re Grenier)*, 2009 WL 763352 at *19 (Bankr. D. Mass. March 19, 2009)(same).

Similarly, courts have also held that a failure to disclose *not* being licensed is a misrepresentation sufficient to support a finding of non-dischargeability under §523(a)(2)(A) when the facts support that a debtor is intentionally misleading someone for his or her personal gain. *Peterson v. Bozzano (In re Bozzano),* 173 B.R. 990, 994 (Bankr. M.D.N.C. 1994), *abrogated on other grounds by Cohen v. de la Cruz*, 523 U.S. 213 (1998)(court found that debt was non-dischargeable because "debtor intentionally created and fostered a false impression regarding his qualifications" even though debtor never affirmatively stated he was a licensed general contractor and creditors never asked him if he had a license).

Moreover, "[B]ankruptcy courts have overwhelming held that a debtor's silence regarding a material fact can constitute a false representation actionable

21

under section 523(a)(2)(A)." *In re Van Horn*, 823 F.2d 1285 (8th Cir. 1987) *abrogated on other grounds by Grogan v. Garner*, 111 S.Ct. 654 (1991)(court found that debtor fraudulently obtained a loan from his mother-in-law by intentionally failing to disclose his deteriorating relationship with his wife); *Hermoyian*, 466 B.R. at 377 (the failure to disclose a material fact can form the basis of either a material misrepresentation or false pretense); *Semaan v. Allied Supermarkets, Inc.,* 951 F.2d 718, 728 (6th Cir.1991) ("That such deception takes the form of an intentional nondisclosure of a material fact or an implied representation makes no difference."); *Brann v. Oxford (In re Oxford),* 440 B.R. 772, 777 (Bankr.W.D.Ky.2010)(a debtor's silence may "create a false impression which would be actionable under § 523(a)(2)(A)....").

With respect to this misrepresentation, the evidence clearly demonstrates that Defendant intentionally fostered the impression that he was a licensed mechanic. Defendant was driving a service mechanic's truck for another company when he met Plaintiff and indicated that it was his truck, and he was a sub-contracted mechanic for that company. Defendant stated he had the ability to bring Plaintiff's truck up to the standard where it would pass a DOT inspection. He told Plaintiff that he owned a repair shop and that he could complete the repairs in a very short period of time. Had Plaintiff known Defendant was not a certified mechanic, Plaintiff asserts that would have never entered a business relationship with Defendant. Defendant never

25-03036-jda    Doc 37    Filed 05/15/26    Entered 05/15/26 16:14:30    Page 22 of 42

corrected this misimpression and, indeed, subsequently confirmed it, and Plaintiff believed that Defendant was licensed even when he filed his complaint with the licensing board. Further, it is illegal for an unlicensed mechanic to accept payment for his services, *See* Mich. Comp. Laws 257.1301 *et. seq.*, and Defendant unambiguously and repeatedly demanded payment from Plaintiff. This evidence supports a finding that Defendant participated in a "mute charade" leading Plaintiff into entering a business relationship with Defendant which, in turn, led to Defendant removing Plaintiff-owned parts from Plaintiff's truck.

Defendant denies that he misled Plaintiff into believing that he was a licensed mechanic. First, Defendant states that he and Plaintiff had an informal repair agreement and that Defendant did not make any representations, express or otherwise, as to his licensure. Plaintiff disputes this, as discussed above.

Second, Defendant claims that Plaintiff knew that Defendant was not licensed, citing multiple text messages where Plaintiff states that he knows Defendant is not a licensed mechanic. This Court finds this argument disingenuous because the text messages relied on by Defendant were sent only after Plaintiff discovered that Defendant was not licensed and contradicted by Defendant's later statement. (Dkt. 24, Ex. 10C).

Third, Defendant claims that no such representation as to licensure was necessary because the vehicle is a farm truck, and as such, can legally be repaired by a non-licensed mechanic citing MCL 257.216(d) (classifying farm vehicles separately from other motor vehicles), MCL 257.33 (defining vehicles covered by the Motor Vehicle Act), and MCL 257.1302(m) (limiting "repair facility" registration to vehicles required to be registered for highway use). The Court does not find this argument persuasive because the evidence clearly shows that Plaintiff's purpose for hiring Defendant was to make his truck road ready for hauling cargo. (Dkt. 21, text messages, pp. 5, 42, 48, 69, 70, 90). In summary, regardless of whether the truck was dropped off with a farm plate, Defendant was well-aware that the purpose of the upgrades was to make the truck safe for use on the roadways. For this reason, this Court finds that to lawfully repair or upgrade Plaintiff's truck, Defendant was required to be a licensed mechanic.

**b. Defendant Intended to Deceive Plaintiff**

The second prong under *Rembert* requires a plaintiff prove by a preponderance of the evidence that the defendant intended to deceive the plaintiff. Under this prong, the inquiry is whether lies and falsehoods were made to a creditor with the intention that the lies or falsehoods be considered true. *In re Childers*, 651 B.R. 699, 726 (Bankr. N.D. Ohio 2023) *citing In re Somogye*, No. 18-3037, 2020 WL 1519315 at *12 (Bankr. N.D. Ohio, March 30, 2020)("The element of intent to

deceive is the heart of the § 523(a)(2)(A) exception to discharge .... [T]he chaff of breach of contract and negligent performance is separated from the wheat of fraud by whether the speaker intended to deceive the listener.").

"A broken promise alone will not establish the existence of any intent to deceive." *Childers*, 651 B.R. at 726-727 *citing In re Hunter*, 535 B.R. 203, 213 (Bankr. N.D. Ohio 2015) and *Strominger v. Giquinto* (*In re Giquinto*), 388 B.R. 152, 166 (Bankr. E.D. Pa. 2008)("It is a matter of well-entrenched jurisprudence that a contractor's failure to perform as promised, standing alone, gives rise to a case for breach of contract, not actionable fraud, misrepresentation or false pretenses under § 523(a)(2)(A)."). Intent to deceive is, instead, measured by a subjective standard and must be determined by the totality of the circumstances. *Childers,* 651 B.R. at 727 *citing Rembert*, 141 F.3d at 281; *see also, In re Somogye*, 2020 WL 1519315 at *13 ("A finding of fraudulent intent may be made on the basis of circumstantial evidence or from the debtor's 'course of conduct,' as direct proof of intent will rarely be available." (citing *Hamo v. Wilson* (*In re Hamo*), 233 B.R. 718, 724 (B.A.P. 6th Cir. 1999)). In close cases, where there is a possibility of honest intent, the question of nondischargeability must be resolved in favor of the debtor." *Childers*, 651 B.R. at 227 *citing In re Mann*, 646 B.R. at 456; *ITT Fin. Servs. v. Szczepanski* (*In re Szczepanski*), 139 B.R. 842, 844 (Bankr. N.D. Ohio 1991).

Here, the totality of the circumstances supports a finding that Defendant intended to deceive Plaintiff. Defendant told Plaintiff that he worked as a subcontracted mechanic for Flory Line Construction and that he owned the service vehicle he was driving when he met with Plaintiff. He further stated that he owned LRS Truck Restoration, something that was confirmed by Spencer, and he told Plaintiff that he was working on the vehicles on his lot. The State, apparently believing that Defendant misled Plaintiff as to his status as a licensed mechanic, cited Defendant with a violation for failing to reveal a material fact to a customer: "Ronald Newman failed to reveal to Bill Klein that the facility and himself were not properly licensed." (Dkt. 19, Ex. 1, Violations). Defendant continued his charade after Plaintiff hired him for the job by expressly telling Plaintiff that he was a certified mechanic. (Dkt. 24, Ex. 10C).

Another reliable indicator of fraudulent intent, particularly in situations involving a debtor-contractor, is whether a debtor-contractor undertook any of the steps necessary to perform as promised. *Childers*, 651 B.R. at 227; *See also, Siebanoller v. Rahrig (In re Rahrig)*, 373 B.R. 829, 834 (Bankr. N.D. Ohio 2007)(Speer, J.)("Thus, as a general rule, this Court has observed that the greater the extent of a debtor's performance, the less likely it will be that they possessed an intent to defraud."); *Mack v. Mills (In re Mills)*, 345 B.R. 598, 605 (Bankr. N.D. Ohio 2006). An inverse relationship is also applicable: an intent to deceive may be

found when a debtor takes no significant measures toward the performance of an obligation; inferences of fraud are muted if the debtor undertakes significant steps to perform as promised. *Childers*, 651 B.R. at 227, *citing In re Rahrig,* 373 B.R. at 834. Here, Defendant never came close to completing the repairs. To the contrary, as evidenced by the ATS Fleet Service report provided after Plaintiff retrieved his truck, the truck was in substantially worse shape than when it was first delivered to Defendant.

### c. Justifiable Reliance on the False Representation

Whether reliance is justified is judged on the circumstances of a particular transaction and requires a creditor to use reasonable care to safeguard his investment. In order to establish justifiable reliance:

> [A] person is "required to use his senses and cannot recover if he blindly relied upon a misrepresentation the falsity of which would be patent to him if he utilized his opportunity to make a cursory examination or investigation."

*Willens v. Bones (In re Bones)*, 395 B.R. 407, 431-32 (Bankr. E.D. Mich. 2011), quoting *Field v. Mans*, 516 U.S. 59, 70-71 (1995); *Jennings v. Bodrick (In re Bodrick)*, 509 B.R. 843, 855 (Bankr. S.D. Ohio 2014); *In re Constantino*, 72 B.R. 231 (Bankr. N.D. Ohio 1987)(the degree of care necessary to show reliance is that degree of care which would be exercised in an average business transaction by parties under similar circumstances); *Van Wert Nat'l Bank v. Druckemiller (In re Druckemiller)*, 177 B.R. 859, 861 (Bankr. N.D. Ohio 1994)(plaintiff relying on

defendant's honesty does not satisfy the reasonable reliance standard under §523(a)(2)(A)).

In this case, Klein justifiably relied on his interactions with Newman as a basis for Newman's ability to complete the job.  Newman answered questions confidently, came to their meeting driving a service mechanic's vehicle which he claimed he owned, indicated that he was sub-contracting as mechanic for a local construction company, and stated that he owned LRS Truck Restoration. Clearly, Newman deliberately fostered the impression that he was qualified, able, and willing to complete the necessary truck upgrades.   Accordingly, Klein's reliance was justifiable.

### d. Plaintiff's Reliance on Defendant's Assertion that he was a Licensed Mechanic Was the Proximate Cause of his Loss.

The State requires a license to protect the public.  Moreover, the threat of losing one's license provides a strong incentive for honesty in dealings with the public. Plaintiff stated that he would have never hired Defendant had he known that Defendant was not licensed because licensure implies a basic level of ability to complete the job.  The Court finds Plaintiff's assertion credible and, accordingly, finds that Defendant's lack of licensure was the proximate cause of Plaintiff's loss.

In summary, because Plaintiff has met all four requirements to establish that his claim against Defendant is non-dischargeable, summary judgment is granted to Plaintiff on his § 523(a)(2)(A) count.

**B. 11 U.S.C. § 523(a)(6): Nondischargeability Based On Willful and Malicious Conduct**

**1. Sufficiency of the Pleadings**

As a preliminary matter, this Court finds that Plaintiff's allegation of conversion is sufficient to serve as an allegation of non-dischargeability under §523(a)(6). The rule regarding pleading requires only that the opposing party have notice of the claims against him. Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 540 U.S. 544, 555 (2007) *citing Conley v. Gibson*, 355 U.S. 41, 47 (1957).[8] The fundamental inquiry is whether the opposing party was on notice of the claims alleged against him.

In this case, Defendant was well-aware that Plaintiff was seeking to have his claims held non-dischargeable under § 523(a)(6) because of Defendant's alleged conversion of Plaintiff's property. Any doubts regarding Defendant's awareness is dispelled by Defendant's own Motion for Summary Judgment which responds

---

[8]This Court also notes that the standard of pleading for *pro se* litigants is lower than the standard for those who are represented by counsel. *In re Thompson*, 668 B.R.156, 178 (6th Cir. BAP 2025)("While *pro se* pleadings are to be liberally construed and held to less stringent standards than formal pleadings drafted by lawyers, *pro se* plaintiffs must still satisfy basic pleading requirements.")

directly to the conversion allegation and specifically addresses § 523(a)(6) in the following paragraphs:

> 37. Section 523(a)(6) applies only where the debtor intended the injury itself, not merely the act.
>
> 38. Defendant retrieved parts only after Plaintiff refused to pay for them. Defendant acted with a claim of right and without malice.
>
> 39. Commercially motivated conduct taken to recover unpaid-for materials does not constitute willful or malicious injury under Sixth Circuit authority.
>
> 40. Plaintiff has shown no evidence of intent to harm.

These allegations in Defendant's Motion for Summary Judgment demonstrate that Defendant understood that Plaintiff's conversion claim was a non-dischargeability claim under § 526(a)(6) notwithstanding that § 523(a)(6) was not specifically pled.

## 2. Willful or Malicious Injury Under § 523(a)(6)

Under § 523(a)(6), debts are excepted from discharge if the debt arises from a "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). To prevail on a claim under this section, a plaintiff must show that:

> (1) the debtor's conduct was willful and malicious, (2) [the creditor] suffered an invasion of [its] legal rights or to the legal rights to [its] property, and (3) the invasion was caused by the debtor's conduct.

*Morse v. Morse (In re Morse)*, 504 B.R. 462, 475-76 (Bankr. E.D. Tenn. 2014)(citations omitted).

The analysis under § 523(a)(6) is two pronged: the injury must be both willful *and* malicious. Because the word "willful" modifies the word "injury" "nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). A willful injury results when the debtor either desires to cause the consequences of his act or "believes that the consequences are substantially certain to result from it." *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir. 1999). As one bankruptcy court has explained,

> "'[t]o find that a debtor intended to cause the consequences of his act or believed that the consequences were substantially certain to result from his act, it is necessary to look into the debtor's mind, subjectively.'" *Gabel v. Olson (In re Olson)*, 355 B.R. 660, 665 (Bankr.E.D.Tenn.2006) (quoting *Monsanto Co. v. Wood (In re Wood)*, 309 B.R. 745, 753 (Bankr. W.D. Tenn. 2004)).
>
> **Proof of willful behavior must often be demonstrated through the use of circumstantial evidence.** *See In re Jones*, 276 B.R. at 802. The bankruptcy court in *In re Jones* noted that "willful" behavior can "be indirectly established by the creditor demonstrating the existence of two facts: (1) the debtor knew of the creditor's … rights; and (2) the debtor knew that his conduct would cause injury to those rights." *Id*. As another bankruptcy court in this Circuit recently observed, "[t]he willfulness element is designed to separate negligent or inadvertent acts from deliberate and intentional ones, and to ensure that the conduct in question falls within the ambit of an intentional tort." *In re Wierenga*, 431 B.R. 180, 185 (Bankr. W.D. Mich. 2010).

*Morse v. Morse (In re Morse)*, 504 B.R. 462, 475-76 (Bankr. E.D. Tenn. 2014)(emphasis added).

A person acts "maliciously" when that person acts "in conscious disregard of his duties or without just cause or excuse." *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986). "A 'just cause' is defined as a 'legally sufficient reason' and a 'just excuse' is defined as a 'reason that justifies an act or omission or [] relieves a person of duty." *MarketGraphics Research Group, Inc. v. Berg (In re Berg)*, 953 F.3d 907, 915 (6th Cir. 2020)(quoting BLACK'S LAW DICTIONARY (11th ed. 2019)). "Elaborating on the meaning of 'conscious disregard,' the Sixth Circuit Bankruptcy Appellate Panel has explained that '[t]here must be a consciousness of wrongdoing .... It is this knowledge of wrongdoing, not the wrongfulness of the debtor's actions, that is the key to malicious under § 523(a)(6).'" *Buzzard v. Ratliff (In re Ratliff),* 673 B.R. 719, 742 (Bankr. S.D. Ohio 2025)(citations omitted). Malice "does not require ill-will or specific intent to do harm." *Wheeler*, 783 F.2d at 615.

Conversion may give grounds for nondischargeability under § 523(a)(6) if the conversion is both (1) willful and (2) malicious. *Davis v. Aetna Acceptance Co.*, 293 U.S. 328 at 332 (1934); *In re Hanif*, 530 BR 655, 670 (Bankr. E.D. Mich. 2015); *Eberhardt v. Comerica Bank,* 171 B.R. 239, 244 (E.D. Mich. 1994). "[N]ot every tort judgment for conversion is exempt from discharge." *Geiger*, 523 U.S. at 63–64. A court has to consider the circumstances surrounding the conversion to determine if it falls within the scope of this exception. *Davis*, 293 U.S. at 332. An innocent or

technical conversion, such as an unauthorized assumption of dominion, without more will not fall within the purview of § 523(a)(6). *Id*.

Defendant moves for summary judgment under § 523(a)(6) claiming that the underlying dispute between Plaintiff and Defendant is merely contractual and that the evidence in no way demonstrates that Defendant willfully and maliciously caused injury to Plaintiff's property. Specifically, Defendant asserts that his conduct was undertaken to recover parts and materials for which payment was not received, and taking steps in furtherance of payment does not constitute willful or malicious injury.

In stark contrast, however, Plaintiff argues that Defendant removed components and parts *belonging to Plaintiff* from Plaintiff's truck, retained them for Defendant's own use, and that he did so with malice. (Complaint, ¶¶ 23, 27). Plaintiff produced evidence substantiating that Defendant acted with an actual intent to cause harm. By way of example, Plaintiff points to Defendant's threatening text message ("U will never make it as a truck drive [sic] or owner. Watch.") sent after Plaintiff filed his complaint with the State and the fact that the truck, which was operable when delivered to Defendant, was essentially destroyed when Plaintiff was finally able to wrest control of it back from Defendant.

### a. Evidence of the Condition of the Truck when Plaintiff Brought it to Defendant

Prior to delivering his truck to Defendant, Plaintiff had ATS Fleet Service perform a DOT inspection. On July 19, 2022, ATS Fleet Service provided Plaintiff with a service report listing the repairs required to pass DOT inspection. Specifically, the service report stated:

> Performed federal annual DOT inspection and truck failed. Made list of needed repairs and recommendations for customer. Check and recharge A/C system. Found no leaks with vacuum. Charge A/C with dye. System will need ran and please inform us of any noticed leaks and exposed dye. Found button to turn on compressor is not working correctly. Set up tuner and send files out to pathhungry per customer request. Received files and followed procedures to tune the PCM. Put 250 HP tune in it and drove. Runs good.

(Dkt. 22, Ex. 4). Only after receipt of this report did Plaintiff drop his truck off at Defendant's facility.

### b. Evidence of Scope of Repairs Plaintiff Hired Defendant to Perform

After determining what upgrades were required to pass a DOT inspection, Plaintiff hired Defendant to perform limited work on his truck. This work was described in a text stream dated October 13, 2022 between Plaintiff and Elisabeth Spencer, agent and director for LRS truck Restoration. In this text stream, Spencer texted Plaintiff to get a copy of whatever proposal Defendant had presented to Plaintiff. Plaintiff responded:

34

Don't think it was a text.  Just in conversation.  Was swap rear end with air, new gear and compressor.  Also, extra fuel tank. I supplied the leaf springs bushings, shocks and have pads for front.  Said since I am giving him calipers and brake parts for the rear end he is keeping, he will supply new one he is putting in or at least pass his DOT inspection. Quoted $3600 for that work. . . Only other thing was he was trying to find different rims.

(Dkt. 23, Ex. 6 p. 1).

### c. Evidence of Condition of Truck after Plaintiff Recovered his Truck from Defendant

When Plaintiff finally recovered his truck, it was inoperable.  Plaintiff then had the truck towed back to ATS Fleet Service for a new inspection where ATS determined that the truck was essentially totaled. The inspection notes, dated September 23, 2025, state:

Inspect truck that was towed into shop. Found coolant was empty. Appears to be leaking from radiator. Radiator and CAC looked damaged and in poor condition. Missing fuel filter. Multiple broken and missing manifold bolts. Missing D/S fuel cell and batteries along with battery tray. Several wiring connections are unplugged and harness plugs are unpinned. Has fuel in P/S tank but has sediment in bottom of tank. Air compressor not hooked up and no air tank on truck. Unable to source wiring schematic to determine how to plug wiring back into harness plugs. Each wire would need figured and OHMED to source. Unable to complete any repairs due to condition of truck nor are we able to source schematics needed. **Our opinion is the repairs needed would far supersede the value of truck.**

*Id.* (emphasis added).  Attached to this inspection report is a handwritten list of repairs needed:

7.  Drive axle brakes and rotors. Probably will need brake calipers

8. Wire not secured on frame, steer axle spring [can't read handwriting] and [??], steer axle shocks

9. Tire rods and tube

10. No reflective tape of on top of cab

11. No reflective tape on back of [??]/mud flaps

12. Mud flaps not secured properly

*Id.*

Plaintiff also provided photographs of the condition of the truck prior to leaving it in Defendant's care and, again, after Plaintiff recovered the truck from Defendant. The first set of photographs show an intact, operational truck. (Dkt. 24, Ex 9, pp. 1-3). The photographs taken when the truck was recovered show missing wheels and tires (Id. at p. 4), missing bolts (Id. at p. 5), a missing headlight (Id. at p. 6), a bent frame (Id. at p. 7), missing batteries, steps, battery box, power invertor, driveshaft, rear axle, stereo, amplifier, speakers (Id. at p. 8), and a missing stereo system (Id. at p. 9).

### d. Evidence of Defendant's Intent to Cause Harm to Plaintiff

In § 523(a)(6) cases Defendants rarely, if ever, admit that they acted willfully and maliciously. Nevertheless, the Court may look to the totality of circumstances and available evidence in making this determination. Here, Plaintiff delivered to Defendant an operational truck, although one not yet able to pass a DOT inspection. After the truck was in Defendant's sole possession and control for over *two and a*

*half years*, Plaintiff recovered a vehicle that was essentially worthless. The condition of the truck, coupled with conversations where Plaintiff was led to believe that Defendant would "delete his truck,"[9] testimony at the 341 meetings in this case where Defendant did not deny the allegations that he stripped Plaintiff's truck,[10] and

---

[9] Plaintiff told the State Investigator that Defendant "threatened to delete my truck so I can't drive it" (Dkt. 19, Ex. 1, Complaint Allegations). And, Defendant told Plaintiff, "U never will make it as a truck drive[sic] or owner. Watch." (Dkt. 21, Ex. 3, text messages, p. 114). The transcript of a conversation between Plaintiff and Defendant held on January 23, 2023 states:

> William: Ive recorded you telling me you're going to delete my fucking computer;
>
> Ron: you said delete it;
>
> William: you said this motherfuckernot, I will I'm saying you will make it so I can't drive the fucking truck;
>
> Ron: I did not say that, when did I ever say that?"

(Dkt. 24, Ex. 10C, p. 3).

[10] At Defendant's March 3, 2025 341 meeting, the following exchange occurred:

> William [Plaintiff]: Is it not true that when I showed up about six weeks ago to get my truck that you had stripped parts out of it? The axle was gone. I'm still talking . .I'm still talking. Is it not true? The trustee has pictures of the truck that I dropped off and the truck that you released out into the yard for me to tow away. Was it not missing the axle, the driveshaft, the batteries, the battery box? The stereo was stolen out of the inside. The power inverters were stolen out of the inside. In was in your- was it not in your possession the entire time behind a locked fence with a supposed camera on it about 50 feet from your house? Is this not true?

Defendant's lack of credibility as demonstrated throughout the record in this case,[i] inescapably lead this Court to conclude that Defendant's actions were willful and malicious.

In summary, this Court finds that there is sufficient evidence in the record to support the granting of summary judgment to Plaintiff on Count IV (conversion).

### IV.   CONCLUSION

For the reasons set forth above, this Court GRANTS Defendant's motion for summary judgment on Count I (breach of contract) and Count III (violation of the MVSRA) of Plaintiff's Complaint.   Conversely, this Court GRANTS summary judgment in favor of Plaintiff on Count II (conversion under § 523(a)(6)) and Count IV (fraud under § 523(a)(2)(A)) of the Complaint.

This Court will hold a telephonic pre-trial conference on June 17, 2026 at 11:00 a.m. EDT to determine the next steps and to schedule a trial on the sole issue of non-dischargeable damages to be awarded to Plaintiff in this case.

---

Ron [Defendant]: The true part is that I took the parts back off that you installed on it that you never paid for. . . .

(Dkt. 24, Ex. 10A, p. 7.) In Defendant's response to this question, he does not deny he removed the other parts.

[i] **Below is a non-exhaustive list of Defendant's answers to allegations set forth in the complaint which conflict with or are not supported by the record**:

**Complaint, 12.** "Defendant breached the agreement by failing to repair the Vehicle, and by failing to be a licensed mechanic as required by Michigan law, as per MVSRA 257.1305. See Exhibit #1."

**Answer, 12.** "Disagree: there was no agreement other then [sic] selling him parts."

Evidence in support of Plaintiff's allegation:

State Investigator's Report stated, "Ron stated that Bill made contact with him wanting Ron to perform repairs on his international truck. . . Ron tried to tell me that he was not completing repairs for the public. I again told Ron that he is completing repairs for Bill on a truck that Ron does not own, and he is charging Bill for the repairs. Ron tried to tell me that he is only charging Bill for parts and that Bill is installing the parts not him and Jeff . . .

. . Jeff said that Ron sold Bill the parts to make the system full air ride and Jeff and Ron have been installing them. I asked Jeff if Bill performed any of the repairs. Jeff said that Bill never helped it has been just him and Ron . . .

**Complaint, 19.** "Plaintiff transported Vehicle to Defendant's shop for upgrade maintenance pursuant to a verbal contract on October 9, 2022."

**Answer, 19.** "Agree; brought his truck there to install parts on and hold till he paid."

Evidence in support of Plaintiff's allegation:

This answer appears to contradict Defendant's response to Complaint, 12 where Defendant states he was only selling parts to Plaintiff.

**Complaint, 22**. "Plaintiff did not give Defendant permission to remove or use the parts of the Vehicle for any purpose beyond ordinary repair as agreed upon in the verbal contract."

**Answer, 22**. "Disagree: only took parts that was not his everything is still there except the rear end that used for a core for new one he never paid for"

Evidence in support of Plaintiff's allegation:

(a) Pictures of the truck show damage to the truck. (Dkt. 24, Ex. 9).
(b) ATS Fleet's report regarding list of repairs needed as of July 19, 2022 and list of repairs needed as of September 23, 2025 (Dkt. 21, Ex. 4).

**Complaint, 23.** "Upon viewing, Defendant has removed additional parts from the Vehicle, retaining them for their own use. See Exhibit #3."

**Complaint, 27.** "Defendant by removing components and parts from Vehicle not only deprived owner of use, but also used the property for its own use."

**Answer 23**. "Disagree: I never took any parts other than mine"

**Answer 27.** "Disagree:"

Evidence in support of Plaintiff's allegation:

(a) Pictures of the truck show damage to the truck. (Dkt. 24, Ex. 9).
(b) ATS Fleet's report regarding list of repairs needed as of July 19, 2022 and list of repairs needed as of September 23, 2025 (Dkt. 21, Ex. 4).

**Complaint, 39.** "Defendant on multiple occasions claimed to be a certified mechanic."

**Answer. 39.** "Disagree:"

Evidence in support of Plaintiff's allegation:

(a) Transcript of Conversation between Plaintiff and Defendant dated January 23, 2023 (Dkt. 24, Ex. 10c, p. 1):

Defendant: You told me you wanted to get a real mechanic, go get a fucking real mechanic.

Plaintiff: Listen, the thing is, for somebody that's not certified. . .

Defendant: I am certified

(b) State Investigator's Report:

. . . Ron is not a certified mechanic, and the company does not hold a valid repair facility license. . .

**Complaint, 40.** "Defendant when asked about his ability to test drive Vehicle if he ever finished work on it, claimed he could use Defendant's dealer plate and that his insurance would cover Vehicle."

**Answer, 40.** "Disagree: Never told Klein that I had a dealer plate or that my insurance would cover it. I told him he could pay for parts and take it"

Evidence in support of Plaintiff's allegation:

Transcript of Conversation between Plaintiff and Defendant dated January 23, 2023 (Dkt. 24, Ex. 10c, p. 6):

Plaintiff: I dont care, you can drive it. I'll just I want to go for a ride while I'm in the passenger seat on the insurance. I have to call on it

Defendant: you do not I got a dealer plate I can put on fucking truck

Plaintiff: I have to tell them

Defendant: you don't gotta tell them shit my insurance gonna covers it

**Complaint, 49.** "Defendant claimed after receiving the State ordered Cease-and-Desist that he was never working on Plaintiff's Vehicle and that Defendant only sold Plaintiff parts and that he doesn't know who Plaintiff had installing them. Even though Vehicle was on Defendant's property and in Defendant's shop."

**Answer, 49.** "Disagree: I never got a cease and desist. I was told not to work on Klein's truck."

<u>Evidence Refuting Defendant's answer</u>:

On March 28, 2023, the State Investigator posted a copy of the Cease and Desist Order, along with a copy of his card containing his phone number, on the building located at the Lewis Road address. On March 30, 2023, Defendant called the State Investigator with questions about the Cease and Desist Order. (Dkt. 19, Ex. 1, Investigator's Notes).

**Signed on May 15, 2026**



/s/ Joel D. Applebaum
_____

**Joel D. Applebaum**
**United States Bankruptcy Judge**